FILED

2023 Sep-26  PM 12:27
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## JASPER DIVISION

| | | |
|---|---|---|
| PAMELA E. BUSBY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 6:22-cv-00920-NAD |
| | ) | |
| SOCIAL SECURITY | ) | |
| ADMINISTRATION, | ) | |
| COMMISSIONER, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER
## AFFIRMING THE DECISION OF THE COMMISSIONER

Pursuant to 42 U.S.C. § 405(g), Plaintiff Pamela E. Busby appeals the decision of the Commissioner of the Social Security Administration ("Commissioner") on her claim for disability benefits. Doc. 1. Plaintiff Busby applied for disability insurance benefits with an alleged onset date of June 1, 2017. Doc. 9-4 at 4; Doc. 9-6 at 2. The Commissioner denied Busby's claim for benefits. Doc. 9-3 at 2–6, 13–26. In this appeal, the parties consented to magistrate judge jurisdiction. Doc. 19; 28 U.S.C. § 636(c)(1); Fed. R. Civ. P. 73.

After careful consideration of the parties' submissions, the relevant law, and the record as a whole, the court **AFFIRMS** the Commissioner's decision.

## ISSUES FOR REVIEW

In this appeal, Busby argues that the court should reverse and remand

1

(1) because the Administrative Law Judge (ALJ) "failed to properly consider Ms. Busby's hand and wrist pain in his RFC [residual functional capacity] finding," (2) because the ALJ's "RFC assessment was not supported by a physician's evaluation," and (3) because the ALJ "failed to consider the opinions of Ms. Busby's treating physical therapists."  Doc. 15 at 16, 18, 20–21.

## STATUTORY AND REGULATORY FRAMEWORK

A claimant applying for Social Security benefits bears the burden of proving disability.  *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).  To qualify for disability benefits, a claimant must show the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrated by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3).

The Social Security Administration (SSA) reviews an application for disability benefits in three stages:   (1) initial determination, including reconsideration; (2) review by an ALJ; and (3) review by the SSA Appeals Council.

*See* 20 C.F.R. § 404.900(a)(1)–(4).

When a claim for disability benefits reaches an ALJ as part of the administrative process, the ALJ follows a five-step sequential analysis to determine whether the claimant is disabled.  The ALJ must determine the following:

 (1) whether the claimant is engaged in substantial gainful activity;

 (2) if not, whether the claimant has a severe impairment or combination of impairments;

 (3) if so, whether that impairment or combination of impairments meets or equals any "Listing of Impairments" in the Social Security regulations;

 (4) if not, whether the claimant can perform his past relevant work in light of his "residual functional capacity" or "RFC"; and

 (5) if not, whether, based on the claimant's age, education, and work experience, he can perform other work found in the national economy.

20 C.F.R. § 404.1520(a)(4); *see Winschel v. Commissioner of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011).

The Social Security regulations "place a very heavy burden on the claimant to demonstrate both a qualifying disability and an inability to perform past relevant work." *Moore*, 405 F.3d at 1211.  At step five of the inquiry, the burden temporarily shifts to the Commissioner "to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform." *Washington v. Commissioner of Soc. Sec.*, 906 F.3d 1353, 1359 (11th Cir. 2018) (quoting *Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987)).    If the

Commissioner makes that showing, the burden then shifts back to the claimant to show that he cannot perform those jobs. *Id.* So, while the burden temporarily shifts to the Commissioner at step five, the overall burden of proving disability always remains on the claimant. *Id.*

## STANDARD OF REVIEW

The federal courts have only a limited role in reviewing a plaintiff's claim under the Social Security Act. The court reviews the Commissioner's decision to determine whether "it is supported by substantial evidence and based upon proper legal standards." *Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997).

**A.** With respect to fact issues, pursuant to 42 U.S.C. § 405(g), the Commissioner's "factual findings are conclusive if supported by 'substantial evidence.'" *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Commissioner of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004).

In evaluating whether substantial evidence supports the Commissioner's decision, a district court may not "decide the facts anew, reweigh the evidence," or substitute its own judgment for that of the Commissioner. *Winschel*, 631 F.3d at 1178 (citation and quotation marks omitted); *see Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) (similar). If the ALJ's decision is supported by substantial

evidence, the court must affirm, "[e]ven if the evidence preponderates against the Commissioner's findings." *Crawford*, 363 F.3d at 1158 (quoting *Martin*, 894 F.2d at 1529).

But "[t]his does not relieve the court of its responsibility to scrutinize the record in its entirety to ascertain whether substantial evidence supports each essential administrative finding." *Walden*, 672 F.2d at 838 (citing *Strickland v. Harris*, 615 F.2d 1103, 1106 (5th Cir. 1980)); *see Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987). "The ALJ must rely on the full range of evidence . . . , rather than cherry picking records from single days or treatments to support a conclusion." *Cabrera v. Commissioner of Soc. Sec.*, No. 22-13053, 2023 WL 5768387, at *8 (11th Cir. Sept. 7, 2023).

**B.** With respect to legal issues, "[n]o . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999.

## BACKGROUND

### A.    Busby's personal and medical history

Busby was born on October 17, 1964.  Doc. 9-4 at 2.

On April 16, 2018, Busby saw Dr. Scottie Twilley (her primary care provider) at the Ralph and Della Haskett Memorial Institute of Medicine and reported moderate pain in her neck and right wrist at an intensity of 7 out of 10 that was better

with medicine and a brace, but worse with activity.  Doc. 9-8 at 53.  Busby had abnormal range of motion with pain in her right wrist and back.  Doc. 9-8 at 55.

On April 23 and May 21, 2018, Busby saw Dr. Twilley and reported neck, wrist, and hand pain at an intensity of 7 out of 10, difficulty sleeping, anxiety, fatigue, and nervousness.  Doc. 9-8 at 39–41, 46.  She had pain with range of motion in her spine and right wrist.  Doc. 9-8 at 41, 48.  In May 2018, Busby reported that her prescription Tylenol "was effective," and Dr. Twilley stated that her pain was stable on her medications and that she could perform activities of daily life with current treatment.  Doc. 9-8 at 41, 45.

In June 2018, Busby saw Dr. Twilley with neck, back, wrist, and hand pain at an intensity of 8 out of 10 with continued pain with range of motion in her spine and right wrist.  Doc. 9-8 at 32–34.  Dr. Twilley also noted in June 2018 that Busby was "having weakness in her legs."  Doc. 9-8 at 34.  Busby's prescription Tylenol was refilled and she was directed also to take ibuprofen for pain.  Doc. 9-8 at 37.  Dr. Twilley stated that Busby's pain was stable on her current medications and that Busby could perform activities of daily life with her current treatment.  Doc. 9-8 at 37.

In July 2018, Busby saw Dr. Twilley and again reported that her pain was at an intensity of 7 out of 10.  Doc. 9-8 at 25.  She also stated that she was having weakness in her legs that she thought was attributable to her blood pressure

medication.  Doc. 9-8 at 27.  Dr. Twilley stated that Busby's pain was stable on medication and that she could perform activities of daily life.  Doc. 9-8 at 31.

In August 2018, Busby saw Dr. Twilley and reported increased back and bilateral hand pain for several weeks, and she continued to have abnormal range of motion.  Doc. 9-8 at 20.  Dr. Twilley noted at that visit that Busby's pain was "uncontrolled."  Doc. 9-8 at 24.

In September and October 2018, Busby saw Dr. Twilley and reported pain in her neck, back, wrists, and hands at an intensity of 7 out of 10, with continued abnormal painful range of motion in her spine and right wrist.  Doc. 9-8 at 3–17. She stated that medicine improved her pain and lifting made it worse.  Doc. 9-8 at 3.  Dr. Twilley noted that Busby's pain was stable on her current medications and that she could perform activities of daily life.  Doc. 9-8 at 10, 17.

On July 19, 2019, Busby had an MRI of her spine that showed no acute injury, but some disc bulges and herniation.  Doc. 9-8 at 91–92.

On August 15, 2019, Busby saw Dr. Mark Downey, an orthopedic surgeon, at Spinegroup Alabama with complaints of chronic constant back pain that was sharp and stabbing in nature and worse with activity.  Doc. 9-9 at 12.  Busby reported to Dr. Downey that she had avoided yard work, shopping, recreation, exercise, and housework for the last month due to pain.  Doc. 9-9 at 12.  Palpation revealed anomalies in her thoracic spine.  Doc. 9-9 at 12.  Dr. Downey discussed the potential

benefits of physical therapy and epidural injections.  Doc. 9-9 at 14–15.  On August 16, 2019, Busby had an MRI for back pain that showed some disc degeneration. Doc. 9-12 at 7.

On August 26 and September 30, 2019, Dr. Downey administered lumbar epidural steroid injections.  Doc. 9-9 at 10–11; Doc. 9-12 at 3–4.

On October 10, 2019, Busby saw Dr. Downey with midback pain.  Doc. 9-9 at 6.  She reported "100% ongoing pain relief" in her lower back after her epidural injections.  Doc. 9-9 at 6.  Busby reported that she had tried rest, heat, ice, modified activities, physical therapy, and pain medication, but nothing had helped her thoracic back pain.  Doc. 9-9 at 6.  Busby reported to Dr. Downey that she had had some bowel urgency over the past couple of months.  Doc. 9-9 at 6.  She stated that her pain was intermittent and sharp and at an intensity of 8 out of 10.  Doc. 9-9 at 6–7. Dr. Downey recommended physical therapy and another epidural injection.  Doc. 9-9 at 9.

Dr. Downey referred Busby to Drayer Physical Therapy, and Busby began physical therapy on November 1, 2019.  Doc. 9-10 at 6; Doc. 9-12 at 2.  Physical therapist Alaina Wisdom noted that Busby reported moderate pain, a moderate to severe functional status, and pain varying in intensity from 5 to 9 out of 10.  Doc. 9-10 at 6.  Busby reported having trouble standing in one place because her legs went to sleep, walking for long distances, navigating stairs, bending, squatting, and

kneeling.  Doc. 9-10 at 6.  Busby's "rehab potential" was described as "good."  Doc. 9-10 at 7.  Busby's wrist and hand movement was noted as being limited secondary to carpal tunnel.  Doc. 9-11 at 4.

On December 3, 2019, Busby saw physical therapist Matthew Tucker at Drayer Physical Therapy, who noted that Busby had pain in her back that varied from intensities of 5 to 9 out of 10, as well as pain in her left hip and side.  Doc. 9-9 at 20.  Tucker stated that Busby was at "46% function" and had improved but still limited range of motion in her spine and decreased strength and sensation in her lower extremities.  Doc. 9-9 at 20.  Busby's "rehab potential" was noted to be "good."  Doc. 9-9 at 21.  Busby reported that she was unable to lift or carry more than 5 to 10 pounds due to pain.  Doc. 9-10 at 2.

On December 9, 2019, Dr. Downey administered another lumbar epidural injection.  Doc. 9-17 at 83, 102, 109.

On December 12, 2019, Busby saw Dr. Twilley with pain in her neck, back, wrists, and hands at an intensity of 4 out of 10 that was improved with medication.  Doc. 9-17 at 45.  Busby had painful range of motion in her right wrist and spine, muscle spasms, and was taking medication including Norco for pain.  Doc. 9-17 at 47–50.  Dr. Twilley noted that her pain was stable on her current medication and that she could perform activities of daily life with treatment.  Doc. 9-17 at 49.

On December 16, 2019, Busby went to the emergency department at Princeton

Baptist Medical Center after she injured her ribs and right forearm in a fall sustained while chasing her dogs.  Doc. 9-15 at 7–10.  Busby was already taking Norco for pain and did not want any new prescriptions for pain.  Doc. 9-15 at 14.

Also on December 16, 2019, Busby was discharged from physical therapy at Drayer Physical Therapy because of the fall that injured her ribs.  Doc. 9-9 at 16–17.  Busby had attended 12 sessions of therapy but still reported back pain.  Doc. 9-9 at 16.  Physical therapist Courtney Smith noted that Busby still reported moderate pain, moderate to severe decreased functional status, difficulty sleeping, moderate loss of motion due to pain, and moderate to severe weakness.  Doc. 9-9 at 16.  Busby had "moderate pain & difficulty" with the activities of daily life and her "discharge prognosis [was] good."  Doc. 9-9 at 17.

In January 2020, Busby saw Dr. Twilley and reported pain in her spine, wrists, hands, and ribs at an intensity of 7 out of 10.  Doc. 9-16 at 77.  Busby was taking multiple medications, including Norco for pain, and suffered from muscle spasms and painful range of motion in her spine and right wrist.  Doc. 9-16 at 79–83.  Dr. Twilley noted that her pain was stable on her current medications and that she was able to perform activities of daily life with her current treatment.  Doc. 9-16 at 83.  In February 2020, Busby reported the same complaints, along with rib pain, and Dr. Twilley had similar findings.  Doc. 9-16 at 69–76.

In March and April 2020, Busby saw Dr. Twilley with similar complaints and

similar findings.  Doc. 9-16 at 53–68.  In May 2020, Busby told Dr. Twilley that, in addition to her previous problems, she was also suffering from bilateral knee pain and weakness.  Doc. 9-16 at 45.  She was taking medications including Norco for pain, and Dr. Twilley noted that her pain was stable on current medications and that she could perform activities of daily life with treatment.  Doc. 9-16 at 50–51.

On June 6, 2020, Busby had an MRI for low back pain that showed "multilevel degenerative changes" in her spine, as well as some disc bulges.  Doc. 9-8 at 89. Busby also had an MRI of her thoracic spine for pain that showed multilevel degenerative changes.  Doc. 9-8 at 90.

From June to August 2020, Busby saw Dr. Twilley multiple times and reported spinal and hand pain with an intensity ranging from 6 to 7 out of 10, which was improved with medication and ice.  Doc. 9-16 at 29, 37, 158.  She also had painful range of motion in her right wrist and spine.  Doc. 9-16 at 31, 39.  Busby was taking medications, including Norco for pain.  Doc. 9-16 at 34, 42.  Additionally, Busby was suffering from muscle spasms.  Doc. 9-16 at 35, 43.  Dr. Twilley noted that Busby's pain was stable on her current medications and that she could perform activities of daily life with current treatment.  Doc. 9-16 at 35, 43, 163.

On July 15, 2020, Busby saw Dr. Winston Capel at Brookwood Neurosurgery, where she complained of spinal pain that had been present for years and was worse with activity.  Doc. 9-15 at 48.  She also complained of other symptoms, including

11

intermittent numbness in her hands.  Doc. 9-15 at 48.  Dr. Capel noted spinal pain that was worse with movement, near normal range of motion, decreased sensation in Busby's fingers, normal gait, and some fine motor impairment.  Doc. 9-15 at 49.

On August 4, 2020, Busby saw Dr. Twilley with back pain and bilateral hand pain at an intensity of 7 out of 10.  Doc. 9-16 at 21.  She stated that her pain was improved with medicine and ice.  Doc. 9-16 at 21.  She had painful range of motion in her right wrist and spine.  Doc. 9-16 at 23.  Busby was taking multiple medications, including Norco for pain.  Doc. 9-16 at 26.  Busby also suffered muscle spasms.  Doc. 9-16 at 27.  Dr. Twilley noted that Busby's pain was stable on her current medications and that she could perform activities of daily life with her current treatment.  Doc. 9-16 at 27.

On August 19, 2020, Busby saw Dr. Capel with continuing back pain and "significant neck pain."  Doc. 9-15 at 59.

In September 2020, Busby saw Dr. Twilley and reported pain in her back and bilateral knee pain at an intensity of 6 to 8 out of 10.  Doc. 9-16 at 5, 13.  She stated that her pain was helped by medication and ice.  Doc. 9-16 at 5.  She had painful range of motion in her right wrist and spine.  Doc. 9-16 at 7, 15.  Busby was taking various medications, including Norco for pain.  Doc. 9-16 at 10, 18.  Busby was also suffering from muscle spasms.  Doc. 9-16 at 11, 19.  Dr. Twilley noted that Busby was able to perform activities of daily life with her current treatment.  Doc. 9-16 at

11, 19.

In September and October 2020, Busby completed work history reports, stating that she had previously worked as a hairstylist, a laborer, and a sales associate.  Doc. 9-7 at 1–11, 31–38.  Busby also filled out an adult disability report on September 10, 2020, stating that she had the following conditions that limited her ability to work:  severe degenerative disc disease; arthritis in the spine, knees, hands, and ankles; hypertension; hypothyroidism; nerve pain; anxiety; and bradycardia.  Doc. 9-7 at 13, 20.  Busby stated that she stopped working on June 1, 2017, due to her conditions.  Doc. 9-7 at 13.

On September 30, 2020, Busby's daughter Camelia Busby filled out a third-party adult function report.  Doc. 9-7 at 23.  Camelia stated that Busby lived alone in a mobile home.  Doc. 9-7 at 23.  Camelia stated that Busby was unable to lift things due to back issues, that her hands or feet sometimes went numb, that she was unable to stand or walk for long periods, that she had difficulty going up and down stairs, and that if she stood still she had to sway so that her legs would not go numb.  Doc. 9-7 at 23.  Camelia stated that Busby mostly socialized by phone or watched TV and took care of a "small chihuahua," though Camelia helped take the dog to the vet and buys supplies for it.  Doc. 9-7 at 24.  Camelia stated that Busby was unable to sleep due to pain, sometimes had trouble with personal care because of pain, and prepared her own meals but only quick or microwave meals.  Doc. 9-7 at 24–25.

13

Camelia stated that Busby was able to clean, do dishes, fold and put away laundry, and sweep, but could only do chores for about 30 minutes at a time and needed help with yardwork and laundry. Doc. 9-7 at 25–26. Camelia stated that Busby could drive or ride in a car, but only for short distances, and could go out on her own. Doc. 9-7 at 26. Camelia stated that Busby shopped for groceries 2 to 3 times per week—but could only do so for about 5 to 15 minutes before having severe pain—and could handle money. Doc. 9-7 at 26. Busby was able to socialize, go to doctors' appointments monthly, and go to Camelia's house multiple times per week for dinner and socializing. Doc. 9-7 at 27.

Camelia stated that Busby had trouble with lifting, squatting, bending, standing, reaching, walking, kneeling, stair climbing, completing tasks, and using her hands, could only walk for about 15 minutes at a time, sometimes finished things she started, and generally understood things and interacted with people normally. Doc. 9-7 at 28–29. Camelia reported that Busby used a cane and a brace/splint and took multiple medications that made her drowsy. Doc. 9-7 at 29–30.

On October 1, 2020, a third party filled out an adult function report on Busby's behalf. Doc. 9-7 at 39. She stated that Busby lived alone in a mobile home and could not lift more than 10 pounds, stand for long periods, walk for long distances, reach overhead, climb stairs frequently, or do much bending over. Doc. 9-7 at 39. She stated that Busby took care of her dog, but that her pain made it difficult to sleep

14

and caused her difficulty with some personal care.  Doc. 9-7 at 41.  She stated that Busby could only prepare microwave meals, and could not stand for a long time because her legs would go numb and her back would "lock up."  Doc. 9-7 at 42.  She stated that Busby was able to do small loads of laundry every two weeks, but had trouble with other chores due to problems with her back, legs, and hands.  Doc. 9-7 at 42.  She stated that Busby could drive and shopped about every two weeks.  Doc. 9-7 at 43.  She also stated that Busby socialized by talking on the phone and went to doctors' appointments once per month.  Doc. 9-7 at 44.  She stated that Busby had problems with lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, completing tasks, and using her hands, and could only walk for about 10 minutes before needing a 5-minute rest, but did not have trouble interacting with people.  Doc. 9-7 at 45.  She stated that Busby used a cane while going up and down stairs.  Doc. 9-7 at 46.

On October 6, 2020, Dr. Downey administered another lumbar epidural injection.  Doc. 9-17 at 83, 87, 96.

In November and December 2020, Busby saw Dr. Twilley and reported spinal pain and pain in her left elbow at an intensity of 6 to 7 out of 10 that improved with medication and rest or ice.  Doc. 9-16 at 123, 130.  Dr. Twilley noted that Busby had painful range of motion in her elbow and spine and had muscle spasms.  Doc. 9-16 at 126, 128, 132, 135.  Busby was taking medication including Norco for pain.  Doc.

9-16 at 127, 134.  In December 2020, Dr. Twilley stated that Busby's pain was stable on her current medications and that she could perform activities of daily life with current treatment.  Doc. 9-16 at 128.

In January 2021, Busby saw Dr. Twilley and reported back pain, left elbow pain, pain in her right wrist, and muscle spasms.  Doc. 9-16 at 116.  Her pain was at an intensity of 6 out of 10 and was improved with rest and medication.  Doc. 9-16 at 116.  Busby was on medication including Norco for pain, her pain was stable on her current medications, and she was able to perform activities of daily life with her treatment.  Doc. 9-16 at 120–21.

In February 2021, Busby saw Dr. Twilley and reported back pain, bilateral wrist pain, left ankle pain, and muscle spasms, with pain at an intensity of 7 out of 10.  Doc. 9-18 at 40.  Busby was prescribed hydrocodone for pain.  Doc. 9-18 at 44.  Dr. Twilley stated that Busby's pain was stable on her current medications and that she was able to perform activities of daily life on her current treatment.  Doc. 9-18 at 45.

In March and April 2021, Busby saw Dr. Twilley and reported the same symptoms, along with bilateral hip and knee pain.  Doc. 9-18 at 26, 33.  Dr. Twilley noted that Busby's pain was stable on her current medications and that she was able to perform activities of daily life with her current treatment.  Doc. 9-18 at 31, 38.

In May, June, and July 2021, Busby saw Dr. Twilley and reported back pain,

muscle spasms, and leg and foot pain and swelling.  Doc. 9-18 at 3, 11, 19.  Busby's pain was continuous and made worse by walking, standing, lifting, and the weather, though it was improved by heat, rest, and medicine.  Doc. 9-18 at 3, 11, 19.  Dr. Twilley noted that Busby's pain was stable on her current medications and that she was able to perform activities of daily life with her current treatment.  Doc. 9-18 at 9, 17, 24.

On June 9, 2021, Busby saw Dr. Capel, who noted that Busby reported hip pain, leg pain, and numbness, with "less significant" low back pain.  Doc. 9-17 at 117–27.  Busby saw Dr. Capel for a follow-up visit on June 29, 2021, and reported continued pain and numbness in her leg.  Doc. 9-17 at 128–33.

On July 30, 2021, Busby reported to Brookwood Medical Center after she injured her back in a fall.  Doc. 9-18 at 56–66.  Busby was experiencing severe pain that was worse with movement.  Doc. 9-18 at 57.  Busby required narcotic pain control but was then discharged; a neurosurgeon suggested that she get a back brace.  Doc. 9-18 at 68.  Busby was diagnosed with a new lumbar compression injury.  Doc. 9-18 at 75.  Busby reported having some shakiness in her hands.  Doc. 9-18 at 75.  Busby reported that she had started taking the medication Lyrica, which had helped her pain.  Doc. 9-18 at 91.

On September 1, 2021, Busby saw Dr. Capel and told him that she had been improving until her fall at the end of July.  Doc. 9-18 at 130.  Busby reported bilateral

hip pain and stated that she was taking oxycodone and Lyrica for pain.  Doc. 9-18 at 130.

### B.    Social Security proceedings

#### 1.    Initial application and denial of benefits

On September 4, 2020, Busby filed an initial application for disability insurance benefits under Title II of the Social Security Act, alleging severe degenerative disc disease, arthritis in the spine, knees, hands and ankles, hypertension, hypothyroidism, nerve pain, anxiety, and bradycardia, with an onset date of June 1, 2017.  Doc. 9-4 at 4; Doc. 9-6 at 2.  On December 16, 2020, Busby's application for disability insurance benefits was denied at the initial level based on a finding by agency physician Dr. Robert Heilpern that there was insufficient evidence to determine disability.  Doc. 9-4 at 2–11.

On January 8, 2021, Busby filed a request for reconsideration of the initial denial of benefits.  Doc. 9-5 at 9.  On March 10, 2021, Busby's application was again denied at the reconsideration level, based on a finding by agency physician Dr. Gloria Sellman that there was insufficient evidence to determine disability.  Doc. 9-4 at 13–26.

Through counsel, Busby requested a hearing before an ALJ (Doc. 9-5 at 10), and a telephonic hearing was held on October 5, 2021.  Doc. 9-3 at 34–36.

On October 20, 2021, the ALJ issued an unfavorable decision, finding that

Busby was not disabled under the Social Security Act.  Doc. 9-3 at 13–26.

### 2.    ALJ hearing

On October 5, 2021, the ALJ held a telephonic hearing on Busby's application for disability insurance benefits.  Doc. 9-3 at 34–36.  The ALJ noted that the relevant time period for review was between the alleged onset date of June 1, 2017, and the date last insured of March 31, 2020.  Doc. 9-3 at 37.

The ALJ asked Busby if any doctor had "specifically restricted your function in any manner," and Busby said that Dr. Twilley and Dr. Capel had recently restricted her lifting because she broke her back on July 30, 2021.  Doc. 9-3 at 37–39.  Busby testified that she was scheduled for an epidural injection and for a "cement" procedure for her back fracture, and would be scheduled for surgery if that procedure did not work.  Doc. 9-3 at 39.  Busby testified that Dr. Capel had also told her that she could not drive after her lumbar fracture.  Doc. 9-3 at 40.  Busby testified that she took five medications.  Doc. 9-3 at 41.  Busby testified that Dr. Capel had recommended a year earlier that she have surgery to "spread [her] disc[s] apart in her back" to help with her legs going to sleep, but she had not had the surgery because she was afraid it would damage her back further.  Doc. 9-3 at 42–43.

Busby testified that she was unable to stand or sit for long periods and had constant arthritis in her joints.  Doc. 9-3 at 44.  She testified that her back pain was "really tremendous" and "always hurting [her] so bad," such that she could not walk

for long periods because of her general pain.  Doc. 9-3 at 44.  She testified that, if she stood up, her legs would go to sleep and she would have to sit down, but she could only sit for "about 10 minutes" before needing to "get back up and move." Doc. 9-3 at 44.  Busby testified that she had severe degenerative disc disease and COPD, for which she took medication and used breathing treatments at night.  Doc. 9-3 at 45–46.  Busby testified that she had a rolling walker that Dr. Twilley had prescribed after her lumbar fracture.  Doc. 9-3 at 46–47.

In response to questioning from her counsel, Busby testified that, on a normal day, she had pain in her back, wrist, and knees because of arthritis, as well as pain in her left ankle and pain in her neck due to a bulging disc.  Doc. 9-3 at 49.  She testified that she took Norco 7.5 for pain with no side effects.  Doc. 9-3 at 50.  Busby testified that she could lift "about three to five pounds" before she started to have pain from her back.  Doc. 9-3 at 57.  She testified that she had shortness of breath while climbing upstairs or if she walked "too long," so she could walk for about 20 or 30 minutes but then had to rest.  Doc. 9-3 at 50–51.  She stated that she is "pretty much in [her] bed most of the time," amounting to 7 hours of an 8-hour day.  Doc. 9-3 at 51.  Busby testified that her average pain level on a regular day was around a 7 out of 10, and sometimes more like a 6 out of 10, but on her "worst day" her pain was a 10 out of 10.  Doc. 9-3 at 51–52.  Busby testified that she gets about 4 hours of sleep per night because she wakes up from pain.  Doc. 9-3 at 52–53.

Busby testified that her daughter helps her with chores around the house.  Doc. 9-3 at 53.  Busby testified that, in terms of doing things around the house, she was only able to go to the restroom, take quick showers, and go to the refrigerator; her daughter helped her with other things.  Doc. 9-3 at 53.  Busby testified that she lived alone.  Doc. 9-3 at 54.  In response to questioning from the ALJ, Busby conceded that she also fed her dog, and could make microwave meals or sandwiches.  Doc. 9-3 at 54–55.  She stated that she did not drive due to pain in her back and ankle and knees, and that her aunt took her to her doctors' appointments.  Doc. 9-3 at 55–56.

Vocational Expert (VE) Sabrina Singleton testified that a hypothetical individual with the limitations posed by the ALJ could perform Busby's past work. Doc. 9-3 at 34, 57–58.  At the end of the hearing, the ALJ asked Busby if there was "[a]nything additional we need to consider in the case," and counsel responded that there was not.  Doc. 9-3 at 58–59.

### 3.    ALJ decision

On October 20, 2021, the ALJ entered an unfavorable decision.  Doc. 9-3 at 13.  In the decision, the ALJ found that Busby met the requirements for insured status through March 31, 2020.  Doc. 9-3 at 16.  "After careful consideration of all the evidence," the ALJ concluded that Busby "was not under a disability within the meaning of the Social Security Act from June 1, 2017, through the date last insured." Doc. 9-3 at 17.

The ALJ applied the five-part sequential test for disability (*see* 20 C.F.R. § 404.1520(a); *Winschel*, 631 F.3d at 1178). Doc. 9-3 at 17–18. The ALJ found that Busby was insured through March 31, 2020, that she had not engaged in substantial gainful activity since her alleged onset date of June 1, 2017, and that Busby had severe impairments of "degenerative disc disease, osteoarthritis, and obesity." Doc. 9-3 at 18–19. In considering Busby's severe impairments, the ALJ noted that Busby complained of back pain, that imaging showed spinal abnormalities, and that Busby's obesity could exacerbate the symptoms of her other medical conditions. Doc. 9-3 at 19.

The ALJ found that Busby had non-severe impairments of "hypertension, hyperlipidemia, insomnia, vitamin deficiency, asthma, chronic obstructive pulmonary disease, bronchitis, [and] Meniere's disease." Doc. 9-3 at 19. The ALJ found that none of those conditions caused Busby to suffer work-related limitations, so they qualified as non-severe. Doc. 9-3 at 19–20. The ALJ found that Busby's "medically determinable mental impairments of depression and anxiety, considered singly and in combination, did not cause more than minimal limitation" and were therefore non-severe. Doc. 9-3 at 20–21. The ALJ found that Busby did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in the applicable Social Security regulations. Doc. 9-3 at 21–22.

The ALJ determined Busby's RFC (or residual functional capacity), finding that Busby could "perform light work" except that she was unable to climb ladders, ropes or scaffolds, or to perform commercial driving, or to work around hazards, and she could occasionally climb ramps or stairs, stoop, or crouch, and could frequently balance, and she could rarely crawl.  Doc. 9-3 at 22.  The ALJ stated that the ALJ had considered all of Busby's symptoms and the extent to which they reasonably could be accepted as consistent with the evidence.  Doc. 9-3 at 22.  The ALJ also stated that the ALJ had considered any medical opinions and prior administrative medical findings.  Doc. 9-3 at 22.

In assessing Busby's RFC and the extent to which her symptoms limited her function, the ALJ stated that the ALJ "must follow" the required "two-step process": (1) "determine[] whether there is an underlying medically determinable physical or mental impairment[] . . . that could reasonably be expected to produce the claimant's pain or other symptoms"; and (2) "evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's work-related activities."  Doc. 9-3 at 22–23.

The ALJ then provided a summary of Busby's alleged conditions limiting her ability to work, including "severe degenerative disc disease, hypertension, hypothyroidism, nerve pain, anxiety, bradycardia, as well as arthritis in the spine, knees, hands, and ankles," and her alleged limitations, including lifting, squatting,

23

bending, standing, reaching, walking, sitting, kneeling, climbing stairs, completing tasks, and using her hands.  Doc. 9-3 at 23.  The ALJ summarized Busby's hearing testimony that that she could not stand or sit for more than 10 minutes at a time, that her legs go to sleep if she stands for long periods of time, that she has breathing difficulties, cannot walk more than 20 to 30 minutes, uses a walker to ambulate, had pain in her neck, wrists, and ankles for which she takes medication, and could lift only 3 to 5 pounds due to back pain.  Doc. 9-3 at 23.

Based on "careful consideration of the evidence," the ALJ found that Busby's "medically determinable impairments could reasonably be expected to cause some symptoms and functional limitations," but that Busby's "statements concerning the intensity, persistence, and limiting effects" of her symptoms "[we]re not entirely consistent with the medical evidence and other evidence in the record."  Doc. 9-3 at 23.  The ALJ found that Busby's "treatment records and diagnostic imaging d[id] not indicate disabling functional limitations arising from her impairments."  Doc. 9-3 at 23.  The ALJ noted that, in April 2018, Busby reported that chronic pain in her neck, back, and wrist was treated with pain medication.  Doc. 9-3 at 23.  The ALJ further noted that in April 2019 Busby had "no respiratory distress, no cyanosis, no clubbing, no edema, and good range of motion of her extremities."  Doc. 9-3 at 23. The ALJ stated that in July 2019 Busby reported back pain, and an MRI showed "spinal stenosis at T7-8 and a disc herniation at T8-9, but no spinal stenosis or nerve

root compromise," and in September 2019 Busby had a lumbar injection that "provided excellent relief of her pain" that continued through a follow-up appointment in October 2019.  Doc. 9-3 at 23.  The ALJ noted that Busby received another injection in December 2019 and received physical therapy, then went to the emergency room a week later due to rib pain after a fall and reported no back pain, but some tenderness in her right forearm, though x-rays showed no acute abnormality.  Doc. 9-3 at 23–24.

The ALJ found that, in June 2020, Busby continued to report back pain, and an MRI showed degenerative changes but not central spinal stenosis, and in July 2020 Busby reported thoracic spine pain, left hip pain, and lower extremity numbness.  Doc. 9-3 at 24.  Busby had full strength and normal gait, but mild impairment of her fine motor skills and pain with rotation of her left hip; she was treated with pain medication.  Doc. 9-3 at 24.  The ALJ found that Busby was diagnosed with tennis elbow in January 2021, but had good range of motion, and that Busby reported lower back and right wrist pain that was treated with medication at multiple follow-up appointments in 2021.  Doc. 9-3 at 24.  The ALJ found that imaging continued to show discogenic changes and that, in July 2021, Busby suffered a spinal compression fracture after a fall, for which a doctor recommended rest and precautions.  Doc. 9-3 at 24.

The ALJ found that, though Busby had been prescribed a walker as part of the

treatment for her lumbar fracture, the evidence did not support that use of the walker was "an ongoing matter," and Busby was "still being evaluated for potential surgical or other remediation and may be appropriately considered after that development in a further application, if the circumstances warrant."  Doc. 9-3 at 24.  The ALJ found that, though Busby's obesity did not prevent her from working or completing a "fairly-full range of activities of daily living," her obesity did combine with her other impairments to affect exertional limitations, such that an RFC allowing for light work with restrictions was appropriate.  Doc. 9-3 at 24.

The ALJ found "not persuasive" the state agency opinions that the evidence was insufficient to evaluate Busby's claim, because those opinions were inconsistent with the medical records as a whole, and because evidence received subsequent to the opinions and the record as a whole suggested that "work at a light exertional level [wa]s more appropriate."  Doc. 9-3 at 24–25.

The ALJ stated that the third-party function report submitted by Camelia Busby qualified as evidence from a nonmedical source, and further stated that the ALJ had reviewed and considered that evidence in reaching a decision.  Doc. 9-3 at 25.

The ALJ found that, in sum, Busby was "capable of performing work" consistent with the RFC determined by the ALJ.  Doc. 9-3 at 25.  The ALJ found that Busby was capable of performing her past relevant work as an assembler.  Doc.

9-3 at 25–26.  Accordingly, the ALJ found that Busby had not been disabled under the Social Security Act through March 31, 2020 (the date last insured).  Doc. 9-3 at 26.

### 4.    Appeals Council decision

On December 17, 2021, Busby appealed the ALJ's decision to the Appeals Council.  Doc. 9-7 at 90.  On June 6, 2022, the Appeals Council denied Busby's request for review of the ALJ's October 20, 2021 decision, finding no reason to review the ALJ's decision.  Doc. 9-3 at 2–6.  Because the Appeals Council found no reason to review the ALJ's decision, the ALJ's decision became the final decision of the Commissioner.  *See* 42 U.S.C. § 405(g).

## DISCUSSION

Having carefully considered the record and briefing, the court concludes that the ALJ's decision was supported by substantial evidence and based on proper legal standards.

## I.    The ALJ properly considered Busby's wrist and hand pain in finding her RFC, and substantial evidence supported the ALJ's RFC determination.

The ALJ properly considered Busby's wrist and hand pain in finding Busby's RFC, and substantial evidence supported the ALJ's RFC determination.  In her briefing, Busby argues that the ALJ should have determined that her wrist and hand pain qualified as a severe impairment and should have accounted for the limitations caused by her wrist and hand pain in the RFC finding.  Doc. 15 at 15–16.  Busby

27

also argues that the ALJ "failed to discuss [her wrist and hand pain] at all." Doc. 15 at 16 (emphasis omitted).

As an initial matter, the ALJ did not completely fail to discuss Busby's wrist and hand pain. As explained above, in finding Busby's RFC, the ALJ repeatedly analyzed Busby's reported symptoms of wrist and hand pain. Among other things, the ALJ stated that Busby listed arthritis in her "hands" as a condition limiting her ability to work and "us[ing] her hands" as an alleged limitation, and that her medical records showed "pain in her . . . wrist" which was treated with medication; the ALJ also reviewed Busby's hearing testimony that she has pain in her "wrist" for which she takes medication. *See, e.g.*, Doc. 9-3 at 23–24.

Moreover, any alleged error in the ALJ's failure to list Busby's wrist and hand pain as a severe impairment at step two of the sequential evaluation process was harmless. At step two of the five-part sequential test, the ALJ found that Busby had severe impairments of: "degenerative disc disease, osteoarthritis, and obesity." Doc. 9-3 at 19. As a preliminary matter, it appears possible that the ALJ's inclusion of "osteoarthritis" as a severe impairment includes Busby's wrist and hand pain. *See, e.g.*, Doc. 9-3 at 23 (finding that Busby reported arthritis in her hands).

Regardless, "[s]tep two of the [sequential] test merely 'acts as a filter,'" so any failure to include Busby's wrist and hand pain as a severe impairment was harmless; that is because, if the ALJ finds any severe impairment or combination of

severe impairments at step two, that is sufficient for the ALJ to "proceed with the rest of the five-step analysis." *Medina v. Social Sec. Admin.*, 636 F. App'x 490, 492 (11th Cir. 2016) (quoting *Jamison v. Bowen*, 814 F.2d 585, 588 (11th Cir. 1987)); *see also Tuggerson-Brown v. Commissioner of Soc. Sec.*, 572 F. App'x 949, 951 (11th Cir. 2014) ("Based on our precedent and the regulations, therefore, it is apparent that there is no need for an ALJ to identify every severe impairment at step two.").

Indeed, in this case, the ALJ found that Busby had several severe impairments including osteoarthritis, then proceeded to the next steps in evaluating Busby's disability claim. Doc. 9-3 at 19–22. Consequently, any failure at step two to specifically include Busby's wrist and hand pain in the list of severe impairments was harmless. *See Medina*, 636 F. App'x at 492; *see also Diorio v. Heckler*, 721 F.2d 726, 728 (11th Cir. 1983) (applying the harmless error standard in the Social Security context).

In addition, substantial evidence supported the ALJ's RFC finding, notwithstanding Busby's reported wrist and hand pain. The ALJ found that Busby had an RFC that allowed her to perform light work with some limitations. Doc. 9-3 at 22. The ALJ stated that the ALJ considered all of Busby's symptoms to the extent they could be accepted as consistent with the evidence and then applied the two-step analysis to assess the extent to which Busby's symptoms limited her function. Doc.

9-3 at 22. The ALJ summarized Busby's alleged conditions and alleged limitations to her ability to work, including arthritis in her hands, difficulty using her hands, arthritis in her joints, and pain in her wrist for which she takes medication. Doc. 9-3 at 23. However, the ALJ found that, while Busby's "medically determinable impairments could reasonably be expected to cause some symptoms and functional limitations," Busby's "statements concerning the intensity, persistence and limiting effects of her symptoms [we]re not entirely consistent with the record." Doc. 9-3 at 23. The ALJ found that Busby's "treatment records and diagnostic imaging d[id] not indicate disabling functional impairments," and that Busby's wrist and hand pain was treated with medication. Doc. 9-3 at 23–24.

As Busby points out in her briefing (*see, e.g.*, Doc. 15 at 14), the record does include evidence that Busby suffered from wrist and hand pain, some painful and limited range of motion, and some numbness in her hands (*see, e.g.*, Doc. 9-7 at 23; Doc. 9-8 at 20, 55; Doc. 9-11 at 4; Doc. 9-15 at 48–49; Doc. 9-16 at 77). But the record does not show clear functional limitations related to Busby's symptoms, beyond those for which the ALJ accounted in the ALJ's RFC finding. For instance, in hearing testimony, Busby testified that her only physician-imposed functional restrictions came after a back injury in 2021. Doc. 9-3 at 37–40. Generally speaking, the record evidence appears to focus more on Busby's back pain as a limiting factor in her ability to function than on her issues with wrist and hand pain. *See, e.g.*, Doc.

Case 6:22-cv-00920-NAD   Document 21   Filed 09/26/23   Page 31 of 40

9-3 at 37–56.  Among other things, the record shows that Busby saw Dr. Downey and Dr. Capel for her back pain, but did not seek specialist treatment for her wrist and hand pain (though she did report intermittent hand numbness to Dr. Capel).  *See* Doc. 9-7 at 17; Doc. 9-9 at 12; Doc. 9-15 at 48, 59.

The record also consistently shows that Busby's pain, including her wrist and hand pain, was stable on her medication, that she was able to perform activities of daily life, and that she was treated conservatively with medication.  *See, e.g.*, Doc. 9-8 at 17, 37, 41, 45; Doc. 9-9 at 17; Doc. 9-16 at 50–51, 83; Doc. 9-17 at 49; *see also Buley v. Commissioner of Soc. Sec.*, 739 F. App'x 563, 571 (11th Cir. 2018) (holding that "the ALJ was permitted to consider the type of treatment [the claimant] received in assessing the credibility of her subjective complaints of pain").

The record shows further that Busby could do activities requiring use of her wrists and hands like feeding her dog, making simple meals, doing dishes, and sweeping.  Doc. 9-3 at 54–55.

Thus, the record includes sufficient evidence supporting the ALJ's RFC finding without additional limitations to account for Busby's wrist and hand pain.  As explained above, substantial evidence requires "such relevant evidence as a reasonable person would accept as adequate to support a conclusion" (*Crawford*, 363 F.3d at 1158); and the court must affirm an ALJ's factual findings if they are supported by substantial evidence, "[e]ven if the evidence preponderates against the

Commissioner's findings" (*Crawford*, 363 F.3d at 1158 (quoting *Martin*, 894 F.2d at 1529)).  Here, there is sufficient evidence that a reasonable person would find adequate to support the ALJ's finding of Busby's RFC, including the absence of any additional limitations for her wrist and hand pain.  *See Crawford*, 363 F.3d at 1158.

## II.   The ALJ properly found Busby's RFC without ordering a consultative physician's evaluation.

The ALJ properly found Busby's RFC without ordering a consultative evaluation by a physician.  In her briefing, Busby argues that the ALJ's "analysis of the state agency examiners' opinions [wa]s extremely flawed," and that the ALJ "was required to order a consultative examination or seek other guidance from a qualified medical professional in assessing" Busby's RFC.  Doc. 15 at 17–18.  Busby also argues that the ALJ erred by interpreting medical findings as a lay person and failing to adequately develop the record by ordering a consultative examination. Doc. 15 at 18–19.

First (as noted above), the ALJ found that the opinions of the state agency consultants—Dr. Heilpern and Dr. Sellman—were "not persuasive."  Doc. 9-3 at 24. Those state agency consultants had opined that "there was insufficient evidence to evaluate the claim," Doc. 9-3 at 24—Dr. Heilpern in December 2020, and Dr. Sellman in March 2021.  *See* Doc. 9-4 at 2–11, 13–26.  The ALJ found that those opinions were not persuasive because they "[were] inconsistent with the medical records as a whole and the evidence received subsequent to [those opinions], to

include opinions and testimony, which indicate work at a light exertional level is more appropriate." Doc. 9-3 at 24–25.

In this appeal, Busby argues that the ALJ's analysis was "extremely flawed, as both [state agency consultants] had all of the medical evidence prior to Ms. Busby's date last insured of March 31, 2020." Doc. 15 at 18 (citation and emphasis omitted). But, as stated in the ALJ's decision, the ALJ found Busby's RFC based on record evidence "from both before and after the date last insured." *See, e.g.*, *Caces v. Commissioner, Soc. Sec. Admin.*, 560 F. App'x 936, 939 (11th Cir. 2014) ("In this case, the ALJ found that [the claimant] was not disabled prior to the date last insured based on ample, unambiguous medical evidence from both before and after the date last insured. Therefore, because the ALJ did not find that [the claimant] was disabled, and because that finding is supported by the evidence, the ALJ did not err in failing to call a medical expert to determine an onset date of such a disability."); *accord Tredik v. Commissioner of Soc. Sec. Admin.*, 826 F. App'x 840, 845 (11th Cir. 2020) (discussing *Payne v. Weinberger*, 480 F.2d 1006, 1007–08 (5th Cir. 1973)). The ALJ's finding that the state agency consultants' opinions were not persuasive properly was based on the medical records as a whole and the evidence received subsequent to those opinions, including additional medical records and the hearing testimony. Doc. 9-3 at 24–25.

In addition, substantial evidence supported the ALJ's finding with regard to

the opinions of the state agency consultants.  The state agency physicians issued their opinions in December 2020 and March 2021, respectively.  *See* Doc. 9-4 at 2–26. Subsequent to those opinions, the record was bolstered with more medical records (*see, e.g.*, Doc. 9-18 at 3–38; Doc. 9-17 at 117–33).  More importantly, Busby gave hearing testimony to the ALJ, and the ALJ was able to question Busby about her functional limitations.  *See* Doc. 9-3 at 34–58.  Therefore, the ALJ had more evidence to consider regarding Busby's functional limitations than the state agency physicians, and substantial evidence supported the decision to find that their opinions—i.e., that there was insufficient evidence to determine disability—were not persuasive.

Next, the ALJ was not required to order a consultative examination.  The ALJ "has a basic duty to develop a full and fair record."  *Henry v. Commissioner of Soc. Sec.*, 802 F.3d 1264, 1267 (11th Cir. 2015).  By statute, the Commissioner must "develop a complete medical history of at least the preceding twelve months for any case in which a determination is made that the individual is not under a disability." 42 U.S.C. § 423(d)(5)(B).  Applicable regulations further clarify that the Commissioner has the responsibility to "develop [the claimant's] complete medical history for at least the 12 months preceding the month in which [the claimant] file[s] [her] application unless there is a reason to believe that development of an earlier period is necessary or unless [the claimant] say[s] that [her] disability began less

34

than 12 months before [she] filed [her] application." 20 C.F.R. § 404.1512(b)(1).

Busby is correct that the ALJ also can order a consultative examination. 20 C.F.R. § 404.1512(b)(3). The ALJ "has a duty to develop the record where appropriate but is not required to order a consultative examination as long as the record contains sufficient evidence for the [ALJ] to make an informed decision." *Ingram v. Commissioner of Soc. Sec. Admin.*, 496 F.3d 1253, 1269 (11th Cir. 2007).

So, while the ALJ does have the "basic duty to develop a full and fair record" (*Henry*, 802 F.3d at 1267), the claimant ultimately "bears the burden of proving that [s]he is disabled, and, consequently, [s]he is responsible for producing evidence in support of h[er] claim." *Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003); *see also* 20 C.F.R. § 416.1512(a) ("[I]n general, you have to prove to us that you are . . . disabled. You must inform us about or submit all evidence known to you that relates to whether or not you are . . . disabled."). And, notwithstanding the ALJ's responsibility to develop a "full and fair" record, "there must be a showing of prejudice before it is found that the claimant's right to due process has been violated to such a degree that the case must be remanded." *Graham v. Apfel*, 129 F.3d 1420, 1422–23 (11th Cir. 1997). The Eleventh Circuit has instructed that "[t]he court should be guided by whether the record reveals evidentiary gaps which result in unfairness or clear prejudice." *Graham*, 129 F.3d at 1423 (quotation marks omitted).

Here, the record was fully and fairly developed. The ALJ had an extensive

record of Busby's medical treatment back to 2018, including records of more than 20 visits to Dr. Twilley, her primary care provider.  *See* 42 U.S.C. § 423(d)(5)(B); 20 C.F.R. § 404.1512(b)(1); *see also, e.g.*, Doc. 9-8 at 1–92; Doc. 9-16 at 50–128; Doc. 9-18 at 1–38.  Throughout the vast majority of Busby's visits to Dr. Twilley, Dr. Twilley specifically noted that Busby's pain was stable and that she could perform activities of daily life.  *See, e.g.*, Doc. 9-8 at 37, 41; Doc. 9-16 at 27, 35, 50–51, 83, 128; Doc. 9-17 at 47–50; Doc. 9-18 at 31, 38, 45.  The record evidence also shows that Busby did not seek surgical intervention for her pain.  Doc. 9-3 at 42–43.  Further, in her own hearing testimony, Busby testified that she had not received any functional restrictions from a physician until her back injury in 2021, after her date last insured.  Doc. 9-3 at 37–39.

In light of the extensive medical evidence in the record, the ALJ did not need to order a consultative examination or rely on a physician opinion in determining Busby's RFC; and there was substantial evidence to support the ALJ's RFC finding. The "task of determining a claimant's residual functional capacity and ability to work rests with the [ALJ], not a doctor."  *Moore v. Social Sec. Admin., Comm'r*, 649 F. App'x 941, 945 (11th Cir. 2016); *see also* 20 C.F.R. § 404.1546(c) ("If your case is at the [ALJ] hearing level . . . , the [ALJ] . . . is responsible for assessing your residual functional capacity.").

Nor could Busby make the required showing of prejudice; there could be no

fact-based argument about how a hypothetical consultative examination would have changed the ALJ's RFC finding, and there are no evidentiary gaps in the record resulting in "unfairness or clear prejudice." *See Graham*, 129 F.3d 1422–23; Doc. 15 at 17–19.

In sum, substantial evidence supported the ALJ's RFC finding, and the ALJ's duty to develop the record did not require the ALJ to order an additional consultative examination. *See Ellison*, 355 F.3d at 1276; 20 C.F.R. § 416.1512(a).

## III. The ALJ properly considered medical records from Busby's treating physical therapists.

The ALJ properly considered the medical records from Busby's treating physical therapists. In her briefing, Busby argues that the ALJ erred by failing to give substantial or considerable weight to the opinions of Busby's treating physical therapists under the treating physician rule. Doc. 15 at 19–21.

As an initial matter, the SSA has revised its regulations on the consideration of medical opinions and prior administrative medical findings for all claims filed on or after March 27, 2017—like the claim in this case. Under those revised regulations, an ALJ need not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s)," including the opinion of a treating or examining physician. 20 C.F.R. § 404.1520c(a). And the Eleventh Circuit has found that the SSA's new regulations validly abrogated the so-called "treating-physician rule," such that an

ALJ no longer is required to defer to the medical opinion of a treating physician. *See Harner v. Social Sec. Admin, Comm'r*, 38 F.4th 892 (11th Cir. 2022).

Regardless, in this case, the evidence from Busby's treating physical therapists does not constitute medical opinion evidence requiring consideration under the new, controlling regulations anyway. *See* 20 C.F.R. § 404.1520c.

In the revised regulations, the SSA did not include physical therapists in the list of accepted medical sources. *See* 20 C.F.R. § 404.1502(a) (listing acceptable medical sources); *R.H.A. v. Kijakazi*, No. 22-CV-639 (ECW), 2023 WL 1971682, at *6 (D. Minn. Feb. 13, 2023) ("a physical therapist is not an acceptable medical source"). And, under those new regulations, the ALJ is "not required to articulate how [the ALJ] considered evidence from nonmedical sources using the requirements" for evaluating medical opinions and prior administrative medical findings. 20 C.F.R. § 404.1520c(d).

In any event, here, the ALJ did consider Busby's physical therapy records in finding Busby's RFC, as the ALJ found that Busby "went through physical therapy" in December 2019. Doc. 9-3 at 23–24 (citing exhibit).

Moreover, pursuant to the applicable regulations, "[a] medical opinion is a statement from a medical source about what [the claimant] can still do despite [her] impairment(s) and whether [she has] one or more impairment-related limitations or restrictions in" the abilities to "perform physical demands of work activities,"

"perform mental demands of work activities," "perform other demands of work," and "adapt to environmental conditions." 20 C.F.R. § 404.1513(a)(2). On the other hand, "objective medical evidence" is defined as "medical signs, laboratory findings, or both," and "other medical evidence" is defined as "evidence from a medical source that is not objective medical evidence or a medical opinion, including judgments about the nature and severity of [the claimant's] impairments, [the claimant's] medical history, clinical findings, diagnosis, treatment prescribed with response, or prognosis." 20 C.F.R. § 404.1513(a)(1), (3).

In this case, the medical records from Busby's physical therapists do not constitute medical opinions under 20 C.F.R. § 404.1513(a)(2). The record evidence includes treatment notes from Busby's physical therapists at Drayer Physical Therapy, but those treatment notes do not include any statements from a medical source about what Busby can still do despite her impairments or whether she has one or more impairment-related limitations or restrictions in her abilities to complete the demands of work. *See* 20 C.F.R. § 404.1513(a)(2); Doc. 9-9 at 16–17, 20–21; Doc. 9-10 at 2–7. Rather, the records show treatment notes regarding Busby's self-reported symptoms, some medical signs, judgments about the nature and severity of Busby's conditions, diagnosis, and treatment plans. Doc. 9-9 at 16–17, 20–21; Doc. 9-10 at 2–7. These treatment notes fall under the definitions for objective medical evidence and other medical evidence, not medical opinions. *See* 20 C.F.R.

§ 404.1513(a)(1)–(3).  Accordingly, the evidence from Busby's physical therapists did not constitute medical opinion evidence, and the ALJ properly considered those records.

## CONCLUSION

For the reasons stated above (and pursuant to 42 U.S.C. § 405(g)), the Commissioner's decision is **AFFIRMED**.  The court separately will enter final judgment.

**DONE** and **ORDERED** this September 26, 2023.

_____
**NICHOLAS A. DANELLA**
UNITED STATES MAGISTRATE JUDGE